# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **CORAN SMITH,** | ) | |
| | ) | **Case No. 12 C 8716** |
| **Plaintiff,** | ) | |
| | ) | **Magistrate Judge Sidney I. Schenkier** |
| **v.** | ) | |
| | ) | |
| **CHICAGO TRANSIT AUTHORITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER[1]

On October 31, 2012, Coran Smith filed suit against the Chicago Transit Authority ("CTA") alleging gender discrimination and retaliation under Title VII and a violation of the Illinois Whistleblower Act (doc. # 1: Compl.). Following discovery and by agreement of the parties, this Court set a briefing schedule for cross-motions for summary judgment limited to Mr. Smith's Title VII retaliation claim (doc. # 38: 10/11/2013 Min. Entry). Now fully briefed, for the reasons set forth below, Mr. Smith's motion for summary judgment (doc. # 51) is denied, and CTA's motion for summary judgment (doc. # 48) is granted in part and denied in part.

## I.

The legal standards governing motions for summary judgment are well-established. Summary judgment is appropriate where the moving party establishes that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmovant "must go beyond the

---

[1]On January 11, 2013, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (docs. ## 13, 15).

pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file), to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in her favor." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168-69 (7th Cir. 2013) (internal citations and quotations omitted).

In deciding a motion for summary judgment, we "construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (internal citations and quotations omitted). We do not "assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence." *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010). That said, we are mindful that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

Northern District of Illinois Local Rule 56.1(a)(3) requires a party who moves for summary judgment to file "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." L.R. 56.1(a)(3). The non-moving party must file "a concise response" to the movant's statement, including specific references to the record in the case of any disagreement. L.R. 56.1(b)(3). Additionally, Local Rule 56.1(b)(3)(C) permits the non-movant to file a statement of additional facts that require the denial of summary judgment. L.R. 56.1(b)(3)(C). Facts in the movant's statement are deemed admitted unless properly controverted by the opposing party. *Id.* Both parties here filed their own statements of material facts (doc. # 50: Def.'s Stmt. of Facts ("DSOF"); doc. # 53: Pl.'s Stmt. of Facts ("PSOF")) and responses to the other party's

statement (doc. # 57: Def.'s Resp. to PSOF; doc. # 59: Pl.'s Resp. to DSOF). Mr. Smith also filed a statement of additional facts (Pl.'s Resp. to DSOF, at 26-29 ("PSAF")), to which CTA responded (doc. # 64: Def.'s Resp. to Pl.'s Stmt. of Add'l Facts ("Def.'s Resp. to PSAF")).

In CTA's response in opposition to Mr. Smith's motion for summary judgment, CTA argues that the PSOF fails to comply with Local Rule 56.1 because the stated facts are immaterial, conclusory, speculative and should be stricken (doc. # 55: Def.'s Resp. in Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s Resp. Br."), at 2). This argument resembles the proverbial pot calling the kettle black: while Mr. Smith's PSOF and PSAF contain some assertions that do not square with the local rule's requirements, the CTA's DSOF and Responses to the PSOF and PSAF suffer from the same problem. The parties' respective statements are anything but concise. They contain numerous assertions in each response, and some assertions constitute argument rather than fact.

Despite the parties' failure to follow the letter of the local rules, we have been able to distinguish their properly asserted statements from any improper ones to determine whether a genuine dispute or valid objection to a fact exists. Therefore, we deny as moot CTA's request – contained in CTA's response to plaintiff's motion for summary judgment (Def.'s Resp. Br. at 3-4) – that we strike Mr. Smith's PSOF. *See, e.g., Northbound Grp., Inc. v. Norvax, Inc.*, 11 C 6131, 2013 WL 6987185, at *2 (N.D. Ill. Dec. 3, 2013) (citing *Zitzka v. Vill. of Westmont*, 743 F. Supp. 2d 887, 897 (N.D. Ill. 2010) (denying motions to strike as moot because of court's ability to separate proper from improper allegations)).

## II.

The following facts are undisputed unless otherwise noted. "When we cite as undisputed a statement of fact that a party has attempted to dispute, it reflects our determination that the

evidence cited in the response does not show that the fact is in genuine dispute." *King v. Chapman*, 09 C 1184, 2013 WL 6709623, at *3 (N.D. Ill. Dec. 16, 2013). "We review only those facts whose substance would be admissible at trial under a form permitted by the Federal Rules of Evidence, although the form produced at summary judgment need not be admissible." *Wragg v. Vill. of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010).

## A.

The CTA has nine Rail Terminals, which are operated under a chain of command starting with the Vice President of Rail Operations and several General Managers (Pl.'s Resp. to DSOF, at ¶¶ 4, 7). Transportation Managers I and II and Administration Managers report to a General Manager (*Id.* at ¶ 7). Many of the Administration Manager and Transportation Manager I duties are the same, but Administration Managers deal more with daily administrative matters such as manpower and budget, while the Transportation Manager I handles more service-oriented issues and day-to-day operations (*Id.*, at ¶¶ 6-7).

Mr. Smith has worked for the CTA in various capacities since October 2001 (Pl.'s Resp. to DSOF, at ¶¶ 2, 14). In 2007 or 2008, Mr. Smith shadowed Transportation Managers I around for about a month, and in August 2008, he became an Administration Manager (*Id.*, at ¶¶ 14-15). On October 1, 2008, Mr. Smith was disciplined by Keith Tuck, Transportation Manager II, for deficiencies in his performance, and on October 16, 2008, he was issued a Poor Work Performance by General Manager Fred Schein for his failure to comply with Mr. Schein's instructions on two occasions (*Id.*, at ¶¶ 16-17).

The parties' statements of facts pick up again on April 23, 2010, when Marlene Taylor, then Acting General Manager of the Elevated Lines, issued Mr. Smith a warning letter reprimanding him for showing up to work late and leaving work early (Pl.'s Resp. to DSOF, at ¶

18). The next month, on May 18, 2010, Ms. Taylor and Daryl Brown, Transportation Manager II, issued Mr. Smith a Manager's Performance Improvement Plan, which stated that Mr. Smith must improve completing reports in a timely fashion, keeping up attendance by not leaving early without authorization, and training other personnel to reduce overtime (*Id.*, at ¶ 19).

On July 14, 2010, Mr. Smith was given a five-day suspension and placed on six months of probation (Pl.'s Resp. to DSOF, at ¶ 20). The Notice of Suspension and Probation stated that Mr. Smith had failed to comply with the improvement plan, and that his "failure to perform his duties [wa]s becoming a burden on me [Marlene Taylor] as well as other staff members" (DSOF, Ex. F: Pl. Dep. # 2, Ex. 22). The Notice stated that further instances of poor performance, absenteeism or tardiness during the six month probationary period ending on December 21, 2010, would result in further discipline, including the possibility of discharge (*Id.*).

In response, Mr. Smith wrote two letters to Edward Cook, Vice President of Rail Operations, complaining about his treatment by Ms. Taylor and requesting a transfer so that he would not have to work for her (Def.'s Resp. to PSOF, Corrected Ex. G: Cook Aff., Exs. B & C). Mr. Cook upheld the discipline issued by Ms. Taylor and denied Mr. Smith's request for a transfer (Pl.'s Resp. to DSOF, at ¶ 22).

On November 22, 2010, Mr. Smith received a Written Warning from Kenneth Beauford, Transportation Manager II, after taking two sick days without following the proper procedures (Pl. Dep. # 2, Ex. 25). Three weeks later, on December 13, 2010, Ms. Taylor was informed that Midway Terminal (where Mr. Smith was then based) was not compliant with a Federal Transportation Authority drug audit (Pl.'s Resp. to DSOF, at ¶ 24). Because Mr. Smith supervised the employee who failed to keep the drug and alcohol records up to date, Mr. Smith was considered "technically aware of" and responsible for this failure (*Id.*).

On December 17, 2010, Ms. Taylor issued Mr. Smith a Notice of "Last Chance" Probation in Lieu of Discharge, which listed several violations of the terms and conditions of his probation, including: (1) jeopardizing people's safety and CTA property by placing himself in the right-of-way on a Red Line platform causing him to be grazed by a CTA train, and failing to immediately report the incident; (2) being disrespectful to management by refusing to be interviewed by Mr. Beauford regarding the incident; and (3) displaying "Gross Misconduct" by acting in an "aggressive, belligerent, irate, and overtly hostile, disrespectful" manner toward Ms. Taylor after she gave an assignment to a Project Specialist over Mr. Smith's objection (Pl. Dep. # 2, Ex. 27). In lieu of discharge, Mr. Smith was issued a ten work-day suspension and placed on a one-year "last chance" probation effective December 20, 2010 through December 19, 2011, during which any gross misconduct, behavioral or safety rule violation, unexcused tardy, early departure or unauthorized work absence would warrant discharge (*Id.*).

## B.

In January 2011, Mr. Cook transferred Mr. Smith to the Howard Terminal, where he continued to work as an Administration Manager, reporting then to General Manager Ronald Ester instead of Ms. Taylor (Pl.'s Resp. to DSOF, at ¶ 26). On June 13, 2011, an audit found that drug and alcohol testing at the Howard Terminal was "looking a little scary," as a large number of cases were missing or not assembled (Pl. Dep. # 2, unstamped doc. between Exs. 26 and 27). The following week, on June 22, 2011, Mr. Ester issued Mr. Smith a Poor Work Performance/Written Warning stating that since Mr. Smith had been assigned to the Howard Terminal, his performance had fallen below acceptable standards because he had failed to: follow terminal procedures, properly maintain drug and alcohol testing documentation, and submit applications from employees for various training programs (Pl.'s Resp. to DSOF, at ¶

27). Mr. Ester notified Mr. Smith that he intended to transfer him to a Transportation Manager I position (*Id.*).

That same day, June 22, 2011, Mr. Smith sent Mr. Cook a letter stating that he did not want to be a Transportation Manager I because it would disrupt his family life (DSOF, Ex. F at 41). In addition, Mr. Smith wrote that he did not want to return to working under Ms. Taylor because it was a "volatile work environment" that had caused him much stress due to his conflict with Ms. Taylor and her management staff (*Id.* at 42). Further, Mr. Smith wrote that he was not qualified for the Transportation Manager I position, and he believed that CTA employee Mina Manning should not replace him as Administration Manager at the Howard Terminal, but instead should be given the Transportation Manager role because she was trained in it (*Id.*).

## C.

On June 26, 2011, Ms. Manning was assigned to be the Administration Manager at the Howard Terminal, and Mr. Smith was assigned to CTA headquarters to be an Administration Manager out of the Vice President of Rail's Office alongside Administration Manager Keith Tuck (Pl.'s Resp. to DSOF, at ¶¶ 29, 32). Mr. Smith's salary, benefits, and seniority remained the same while working out of the Vice President's office, but he was initially not assigned his own cubicle, computer, or telephone (*Id.*, at ¶¶ 30-31). This transfer increased the total number of Administration Managers from ten to eleven; previously, the CTA had one Administration Manager for each of the nine rail terminals, plus Mr. Tuck (*Id.*, at ¶ 32; Def.'s Resp. to PSOF, at ¶ 50).

On September 8, 2011, plaintiff filed a charge with the Illinois Department of Human Rights ("IDHR") and the Equal Employment Opportunity Commission ("EEOC"), alleging gender discrimination and retaliation (Pl.'s Resp. to DSOF, at ¶ 62). Mr. Smith alleged that he

had been replaced by a female employee (Ms. Manning) with fewer years of service than he, and that he had been placed at a desk at CTA headquarters without a telephone and given very little work to do in retaliation for requesting a transfer away from Ms. Taylor because of her alleged harassment of him (Compl., Ex. A: First IDHR Charge, at 2-3).

On October 24, 2011, Mr. Smith received an Illinois Workers Adjustment and Retraining Notification ("WARN letter") from CTA informing him that he had been selected for proposed layoffs effective December 31, 2011 (PSOF, Ex. N). However, on December 23, 2011, Mr. Smith received a letter from Larry Wall, Acting Vice President of Human Resources of CTA, stating that the lay-off notice had been rescinded (Pl.'s Resp. to DSOF, at ¶ 33; PSOF, Ex. O). Nevertheless, Mr. Wall informed Mr. Smith that he could not continue working as an Administration Manager because that position at the Vice President's office was being eliminated and no other Administration Manager positions were available (Pl.'s Resp. to DSOF, at ¶¶ 34-35). On January 9, 2012, Mr. Smith was assigned to a Transportation Manager I position at the Blue Line Terminal (Id., at ¶¶ 35-36). Again, this transfer did not alter Mr. Smith's salary, benefits or seniority (Id., at ¶ 7).

### D.

On March 6, 2012, Mr. Smith attended an IDHR fact-finding conference for the IDHR charge he had filed in September 2011 (Pl.'s Resp. to DSOF, at ¶ 37). In advance of the conference, Mr. Smith's attorney forwarded CTA copies of eight pages of emails that he had received from Mr. Smith for use at the conference (Id.; Def.'s Resp. to PSOF, at ¶ 24). Mr. Smith was not listed as a recipient on any of the emails (Id.). The emails included: (1) a June 22, 2011 email from Kim Morris (Manager, Administration, Office of the Vice President, Bus Operations) to several CTA employees, with the subject line "COO's Office, Bus/Rail

Operations – Management Moves, Effective Sunday June 26, 2011," listing four management moves, including that Ms. Manning would be "transferred from the VP, Bus Ops Office to Howard Rail Terminal as the Administration Manager," and Mr. Smith would be "transferred from the Howard Rail Terminal to the Elevated Lines as a Transportation Manager" (PSOF, Ex. C); (2) a July 14, 2011 email from Mr. Tuck to Chaneta Johnson (Manager, Administration, Transit Operations) and Mr. Cook, attaching 2011 fiscal year budgeted positions, proposed 2012 budgeted reductions per position, and a spreadsheet detailing 28 positions to be eliminated, which did not include Mr. Smith (Pl.'s Resp. to DSOF, at ¶ 41); (3) a July 15, 2011 email from Mr. Tuck to Ms. Johnson, attaching a revised spreadsheet of proposed 2012 budget reductions per position, which also detailed 28 potential positions to be eliminated, but this time included Mr. Smith's position, which was identified as a Transportation Manager (PSOF, at ¶ 10); and (4) a December 20, 2011 email from Ms. Johnson to several CTA employees stating that Transit Operations sought to transfer Mr. Smith from his position as Administration Manager, which position was to be eliminated on January 1, 2012, to a Transportation Manager I position, to make Mr. Smith "exempt from the 2012 Layoffs" (PSOF, Ex. C).

On March 14, 2012, plaintiff filed a second IDHR Charge alleging gender discrimination and retaliation (Pl.'s Resp. to DSOF, at ¶ 64). He repeated the allegations from his first IDHR Charge and added that in January 2012, he was transferred to a Transportation Manager position, which was slated for elimination in Summer 2012, while Ms. Manning's position as Administration Manager was not being eliminated (PSOF, Ex. F). Mr. Smith alleged that the transfer and subsequent schedule for elimination was pretext for gender discrimination and retaliation for filing his first IDHR charge (*Id.*; Pl.'s Resp. to DSOF, at ¶ 65).

**E.**

In the meantime, CTA made clear that it viewed the documents used at the March 6 fact-finding hearing as confidential, and wanted them returned or destroyed (Pl.'s Resp. to DSOF, at ¶ 37).[2]  When Mr. Ester was informed that Mr. Smith had disclosed these documents to the IDHR, he instructed his General Manager, Thomas Reilly, to investigate, who in turn asked Transportation Manager II, Kenneth Elam, to interview Mr. Smith (*Id.*, at ¶ 47).  On March 7 and 8, 2012, Mr. Elam attempted to interview Mr. Smith, but Mr. Smith refused to speak without his attorney, so the interview was continued (*Id.*, at ¶ 48; Def.'s Resp. to PSAF, at ¶ 21).  On March 9, 2012, Mr. Reilly joined Mr. Elam at the interview, and Mr. Smith initially agreed to speak in the absence of his attorney (Pl.'s Resp. to DSOF, at ¶ 48; Def.'s Resp. to PSAF, at ¶ 22).  Mr. Smith admitted that he had access to Mr. Tuck's computer (where these emails could have been found), but he did not admit or deny accessing Mr. Tuck's email to obtain the documents at issue (Pl.'s Resp. to DSOF, at ¶ 51).[3]  Mr. Smith refused to answer Mr. Reilly's remaining questions, and advised Mr. Reilly to contact his attorney (*Id.*, at ¶ 53).  Mr. Smith was then placed on administrative leave with pay (Def.'s Resp. to PSOF, at ¶ 21).

On or about March 22, 2012, Mr. Reilly wrote a letter to Mr. Ester recommending that Mr. Smith be discharged for "failure to protect CTA-owned property and proprietary information and/or disclosing information in violation of CTA rules and policies" (Def.'s Resp. to PSOF, Corrected Ex. I:  Reilly Aff., Ex. 3; Pl.'s Resp. to DSOF, at ¶ 57).  On April 3, 2012, Mr. Smith

---

[2]The December 20, 2011 email was actually labeled as confidential; the other emails did not contain that designation.

[3]Mr. Smith contends that in late February or early March 2012, the documentation was left for him by an anonymous source in a long, white envelope with his name written on it at his desk at the CTA (PSOF, at ¶ 10). However, it is undisputed that Mr. Smith did not tell CTA how he obtained the documents at the March 2012 interviews (Def.'s Resp. to PSOF, at ¶¶ 10, 25). But, the parties dispute whether plaintiff's attorney informed CTA in March 2012 how Mr. Smith obtained the documents, and CTA contends that plaintiff first informed CTA how he received the documents at his Section 28 discharge hearing on July 12, 2012 (*Id.*).

was given an official notice of termination for failure to perform his duties as a Transportation Manager by failing to protect CTA-owned property and proprietary information and disclosing information in violation of CTA rules and policies, including: Rules Numbers 7 (Obedience to Rules), 13 (Disclosure of Official Business), 14 (Personal Conduct), and 24 (Use of Best Judgment); Ethics Ordinance Code of Conduct Sections 2.1 (Appearance of Impropriety), 2.2 (Fiduciary Duty), 2.6 (CTA-Owned Property), and 2.7 (Use or Disclosure of Confidential Information); and Administrative Procedure 222 (Internal and External Electronic Communication) (Reilly Aff., Exs. 3 and 4).

Mr. Smith received a hearing following his discharge pursuant to Section 28 of the Metropolitan Transit Authority Act ("Section 28 Discharge Hearing"), which was held on July 12, 2012 (Pl.'s Resp. to DSOF, at ¶ 59). At the hearing, Mr. Smith testified that he believed he was allowed to access some of the confidential information pursuant to the CTA ethics training manual (*Id.*, at ¶ 60). He also testified that the documents were left anonymously for him on his desk in an envelope with his name on it (Def.'s Resp. to PSOF, at ¶ 10). Mr. Reilly testified that he recommended terminating Mr. Smith because he had violated CTA rules and regulations, was uncooperative and evasive during the ensuing investigation, performed personal work while on duty, and diverted CTA resources for his personal use (*Id.*, at ¶¶ 28, 35). The Chicago Transit Board upheld plaintiff's discharge (Pl.'s Resp. to DSOF, at ¶ 61).[4]

## III.

Both parties have moved for summary judgment regarding Count II of Mr. Smith's complaint, which alleges that CTA retaliated against him for his complaints of discrimination

---

[4]On May 4, 2012, plaintiff filed his third IDHR Charge alleging that he was discharged in retaliation for filing the previous two IDHR charges and for providing the IDHR with evidence of his claim (Pl.'s Resp. to DSOF, at ¶ 67).

and other protected activity, in violation of Title VII. For the reasons that follow, we deny Mr. Smith's motion and grant CTA's motion in part.

"Title VII forbids retaliating against an employee 'because he has opposed any practice made . . . unlawful . . . by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" *Collins v. Am. Red Cross*, 715 F.3d 994, 998 (7th Cir. 2013) (quoting 42 U.S.C. § 2000e-3(a)). Mr. Smith has chosen to proceed under the direct method of proving retaliation under Title VII (doc. # 52: Pl.'s Mem. in Supp. of Mot. for Partial Summ. J. ("Pl.'s Mem.") at 5). "To survive summary judgment on a Title VII retaliation claim under the direct method of proof, a plaintiff must submit evidence from which a jury could reasonably conclude that (1) he engaged in statutorily protected activity; (2) he suffered a materially adverse action; and (3) [there was] a causal link between the two." *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 508 (7th Cir. 2014).

In his complaint, Mr. Smith contends that he engaged in several statutorily protected activities (complaining to Mr. Cook about working for Ms. Taylor, filing charges with the IDHR, and supporting those charges with allegedly confidential emails) and that he suffered several materially adverse actions (being transferred to CTA's headquarters, issued a layoff notice, transferred to a Transportation Manager I position, and ultimately terminated) in retaliation for his protected activities.[5] CTA argues that it is entitled to summary judgment on Mr. Smith's Title VII retaliation claim because: (1) none of Mr. Smith's activities, except for filing complaints with the IDHR, were protected; (2) none of CTA's actions, except for termination,

---

[5] Mr. Smith also contends that these actions were part of a "scheme" by the CTA to terminate him or set him up for failure (doc. # 58: Pl.'s Resp. to Def.'s Mot. for Summ. J. ("Pl.'s Resp. Br.") at 6-7). In his complaint, however, Mr. Smith does not allege the existence of a conspiracy to retaliate against him or any agreement between CTA employees to terminate him, and the parties do not attempt to address the elements of conspiracy in their pleadings. Thus, perhaps Mr. Smith's invocation of the word "conspiracy" is merely a rhetorical flourish. But, to the extent that Mr. Smith seeks to add by his briefing a conspiracy claim that he never has pled, we do not permit him to do so.

constituted materially adverse actions; and (3) CTA had legitimate, non-retaliatory, non-pretextual reasons to terminate Mr. Smith, namely, his disclosure of confidential CTA documents and his failure to cooperate with the ensuing investigation into that disclosure (doc. # 49: Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") at 3-8, 10-11, 14-15). By contrast, in his motion, Mr. Smith contends that CTA cannot show that he was terminated "for any reason other than for pursuing his discrimination and retaliation claims," and thus, that he is entitled to summary judgment on his Title VII retaliation claim (Pl.'s Mem. at 1).

For the reasons explained below, we grant CTA's motion in part and dismiss Mr. Smith's retaliation claim only to the extent that his claim is based on a materially adverse action other than his termination. Nevertheless, we find that there are genuinely disputed issues of material fact as to whether Mr. Smith was indeed discharged in violation of Title VII; therefore, the parties' dueling requests for summary judgment on that claim are denied.

## A.

Initially, Mr. Smith claims that CTA retaliated against him for complaining to Mr. Cook that he did not want to work for Ms. Taylor by transferring him to an Administration Manager position at CTA's headquarters with no cubicle, computer, or telephone. This retaliation claim fails because Mr. Smith's complaints to Mr. Cook did not constitute protected activity, and his job transfer did not constitute a materially adverse action under Title VII.

"Vague and obscure complaints do not constitute protected activity" under Title VII, *Northington v. H & M Int'l*, 712 F.3d 1062, 1065 (7th Cir. 2013) (internal quotations omitted), and internal complaints are only protected "if the employee complains of discrimination on an impermissible ground," *Peters v. Wal-Mart Stores East, LP*, 512 Fed. App'x 622, 627 (7th Cir. 2013). Here, Mr. Smith's internal complaints to Mr. Cook (as evidenced by the letter Mr. Smith

sent to him) demonstrate that Mr. Smith was complaining about: (1) a personal conflict between himself and Ms. Taylor, which he did not characterize as involving impermissible discrimination; and (2) a proposed job transfer that he said did not comport with his life as a "family man" (Pl. Dep. # 2, Ex. 29). We understand why an employee might complain about such matters, but as in *Northington* and *Peters*, those types of internal complaints are not protected under Title VII.

Moreover, Mr. Smith has failed to create a triable issue on whether his transfer to CTA headquarters constituted a materially adverse action. While Mr. Smith was temporarily without his own cubicle, computer and telephone at CTA headquarters, it is undisputed that his salary, benefits and seniority remained the same. The Seventh Circuit has "repeatedly held that a lateral transfer without a loss in benefits does not constitute an adverse employment action." *Stutler v. Ill. Dep't of Corr.*, 263 F.3d 698, 702 (7th Cir. 2001). The "loss of a telephone or cubicle," by itself – in this case, for only the first two of the six months Mr. Smith spent at CTA headquarters – does not constitute a materially adverse action. *Id.* at 703; *see also Matthews v. Donahoe*, 493 Fed. App'x 796, 800 (7th Cir. 2012) (mere "annoyance" that had no effect on the terms of the plaintiff's employment did not constitute a materially adverse action). Therefore, we grant partial summary judgment to the CTA on Mr. Smith's claim that his transfer to CTA headquarters constituted retaliation.

**B.**

Next, Mr. Smith claims that CTA retaliated against him for filing his first IDHR charge (in which he complained about his transfer to CTA's headquarters) by issuing him a layoff notice, and then transferring him out of CTA headquarters and into a Transportation Manager I position. While there is no dispute that filing an IDHR charge constitutes a statutorily protected

activity, neither the lay-off notice nor the transfer to Transportation Manager I constitute a materially adverse action under Title VII.

"Title VII's antiretaliation provision must be construed to cover a broad range of employer conduct . . . and [i]t is not limited to discriminatory actions that affect the terms and conditions of employment." *Porter v. City of Chi.*, 700 F.3d 944, 956-57 (7th Cir. 2012) (quoting *Thompson v. N. Am. Stainless, LP*, – U.S. –, 131 S.Ct. 863, 868 (2011). In the retaliation context, "[m]aterially adverse actions are those that might dissuade a reasonable employee from engaging in protected activity." *Benuzzi v. Bd. of Educ. of City of Chi.*, 647 F.3d 652, 665 (7th Cir. 2011) (citing *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006)). An "empty threat" to remove or demote an employee from a position, where the employee "was never in fact removed or demoted, even temporarily," does not constitute a materially adverse action. *Benuzzi*, 647 F.3d at 665; *see also Ajayi v. Aramark Bus. Servs.*, 336 F.3d 520, 531 (7th Cir. 2003) (employer's memorandum to plaintiff stating that her position was being eliminated and that she would be demoted two weeks later did not constitute materially adverse action because the threatened demotion never actually happened). Here, the lay-off notice to Mr. Smith was rescinded without him being laid off, and thus it was not a materially adverse action.

In addition, Mr. Smith's transfer from the Administration Manager position in the Vice President's office to a Transportation Manager I position did not constitute a materially adverse action. As described above, Mr. Smith admitted that the Transportation Manager and the Administration Manager positions "are equal in pay, rank and seniority and CTA has transferred employees between the two positions" (Pl.'s Resp. to DSOF, at ¶ 7). In addition, Mr. Smith does not dispute that the Administration Manager position in the Vice President's office was being

eliminated, and that there was no open Administration Manager position anywhere else at that time.

Mr. Smith attempts to argues that the transfer to Transportation Manager was nevertheless materially adverse because it placed him "in a position where he lost position seniority and became the first eligible for layoff should his position become eligible for layoffs" (Pl.'s Mem. at 4), and he had insufficient training to properly perform the job (Pl.'s Resp. Br. at 3). We find these arguments unpersuasive.

*First*, there is no dispute that Mr. Smith was not, in fact, laid off because of his lack of seniority or lack of training in the Transportation Manager position. As explained below, Mr. Smith contends that he was terminated for allegedly protected activity: (1) disclosing the allegedly confidential documents in support of his IDHR claims; or (2) in the alternative, complaining and filing charges with the IDHR alleging that Ms. Taylor had discriminated against him.

*Second*, plaintiff has offered no evidence as to how seniority at CTA determines the ability to obtain or hold particular positions. For example, he presents no evidence that CTA employees' seniority or eligibility for layoffs was based on the length of time they served in their positions rather than their tenure at the CTA. Nor does Mr. Smith submit evidence to show that if he in fact were to be laid off from the Transportation Manager position at some undetermined and unknown future time, he would be unable to use his tenure at CTA to bid into other positions. The Seventh Circuit has "not foreclose[d] the possibility that a plaintiff could argue that a singular threat of termination had the impact of dissuading a reasonable worker from supporting a discrimination complaint, which might act as the necessary adverse action underlying his retaliation claim." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 681 n.2 (7th

Cir. 2010). Here, however, Mr. Smith does not demonstrate that he suffered a "singular threat of termination" due to his transfer into the Transportation Manager position, but rather, he offers a speculative and unsubstantiated possibility of future harm.

While Mr. Smith may have had a "personal preference" for the Administration Manager position, his transfer to Transportation Manager (where his Administration Manager position was being eliminated and there were no other available Administration Manager positions) was not a materially adverse action for purposes of a Title VII retaliation claim; the transfer (to a position with equal pay, rank and seniority) would not dissuade a reasonable worker from bringing a discrimination charge. *See Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 729-30 (7th Cir. 2009) (holding that the plaintiff's "personal preference" to teach 12th grade English rather than 7th grade English did not constitute a materially adverse action); *see also Porter*, 700 F.3d at 957 (holding that the plaintiff's assignment to the Friday/Saturday days-off group, instead of to her preferred Sunday/Monday days-off group, was not a materially adverse action for purposes of her retaliation claim); *Silverman v. Bd. of Educ. of City of Chicago*, 637 F.3d 729, 740-41 (7th Cir. 2011) (holding that the plaintiff's transfer to a new, more difficult position after she had lost her previous position did not constitute a materially adverse action because the employer offered the only position that was available at that time for someone with her qualifications); *Dass v. Chi. Bd. of Educ.*, 675 F.3d 1060, 1069-70 (7th Cir. 2012) (holding that the plaintiff did not suffer a materially adverse action where she was denied her preferred teaching position and put into a different, and what she believed to be more difficult, position). Therefore, we grant partial summary judgment to the CTA on Mr. Smith's claim that his receipt of a lay-off notice and his transfer to a Transportation Manager I position constituted retaliation.

## C.

We now turn to Mr. Smith's claim that he was terminated in retaliation for protected activity. Mr. Smith contends that he has presented direct evidence that he was terminated in retaliation for protected activity, because CTA admits that it fired him for disclosing allegedly confidential documents in support of his IDHR claim (Pl.'s Mem. at 6-7). CTA disputes that Mr. Smith's disclosure of confidential documents in the context of the IDHR investigation was protected activity. In the alternative, Mr. Smith contends that he has presented sufficient circumstantial evidence to show that he was terminated because he filed charges with the IDHR alleging that Ms. Taylor had discriminated against him (doc. # 58: Pl.'s Resp. to Def.'s Mot. for Summ. J. ("Pl.'s Resp. Br.") at 8-10). CTA does not dispute that Mr. Smith's termination was an adverse employment action, or that his filing an IDHR charge was a protected activity, but CTA contends that Mr. Smith cannot show a causal link between his filing the IDHR charge and his termination. We address Mr. Smith's alternative arguments separately below.

### 1.

"Direct evidence of retaliation may be proven by evidence showing retaliation without resort to inference, *i.e.*, something along the lines of a direct admission" by the employer that the plaintiff's complaints caused the materially adverse employment action. *Naficy v. Ill. Dep't of Human Servs.*, 697 F.3d 504, 512-13 (7th Cir. 2012) (internal citations omitted). Here, CTA admits that it terminated Mr. Smith for violating CTA rules and regulations when he disclosed confidential documents to his attorney and the IDHR investigator in advance of the March 6, 2012 IDHR fact-finding conference and for failing to cooperate in CTA's investigation into this disclosure. Mr. Smith argues that this constitutes direct evidence that CTA terminated him for engaging in protected activity because he disclosed the documents for the express purpose of

supporting his claims of discrimination and retaliation (Pl.'s Resp. Br. at 10-11, 14). For its part, CTA argues that Mr. Smith's disclosure of confidential information was not protected activity.

The parties both invoke *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714 (6th Cir. 2008), in their debate as to whether Mr. Smith's disclosure of the documents was protected activity. In *Niswander*, the Sixth Circuit set forth several considerations for determining "whether the employee's dissemination of confidential documents was reasonable," and thus protected under the circumstances. *Id.* at 725-26. Initially, the *Niswander* court explained that an employee's dissemination of confidential documents was more likely to be reasonable in the context of "participating" in a Title VII lawsuit, investigation, or hearing – that is, when the documents related to the plaintiff's own lawsuit or claims – than where the employee disclosed the documents in the context of "opposing" her employer's unlawful employment practices, *i.e.*, when the documents were not directly related to the plaintiff's claims.[6] *Id.* at 726-27. In *Niswander*, the court determined that the plaintiff's disclosure of confidential documents constituted "opposition," not participation, under Title VII because the documents did not relate to her Equal Pay Act or retaliation claims, but rather "did nothing more than jog her memory about incidents that she believed constituted retaliation." *Id.* at 726-27.

The *Niswander* court then listed six additional factors to consider in determining whether the employee's dissemination of the confidential material was reasonable, including how the documents were obtained, to whom and why they were produced, whether a breach of confidentiality could have been avoided, and the content of the documents. *Niswander*, 529 F.3d

---

[6]As the court in *Niswander* explained, the distinction between participating in a lawsuit and opposing an employment practice is set forth in the text of Title VII, which forbids an employer from "discriminat[ing] against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII] [the so-called 'opposition clause'], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII] [the so-called 'participation clause']." *Niswander*, 529 F.3d at 719-20 (quoting 42 U.S.C. § 2000e-3(a)).

at 726. Ultimately, the court determined that the plaintiff's disclosure of confidential documents did not "constitute the kind of reasonable opposition activity that justifies violating a company's privacy policy," because there were "readily available alternatives" to jogging her memory as to alleged retaliation. *Id.* at 727. Therefore, the plaintiff's delivery of the confidential documents did not qualify as protected activity and could not provide support for her *prima facie* case of retaliation. *Id.* at 727-28.

While the parties here do not address whether Mr. Smith was "participating" in a Title VII proceeding or "opposing" an unlawful employment practice, Mr. Smith maintains that "he in good faith believed [the documents] were supportive of his claims that he was being retaliated against for opposing gender discrimination and retaliation in the workplace" (Pl.'s Mem. at 3). CTA disputes, however, that the documents provided evidence of discrimination or retaliation against Mr. Smith (Def.'s Resp. Br. at 7-8). In addition, CTA raises genuine disputes as to some of the remaining six *Niswander* factors, including the potential scope of the confidentiality breach, and whether Mr. Smith could have avoided a confidentiality breach by getting permission to disclose the documents or by providing the information to his attorney in synopsis or redacted form (*see Id.* at 6-9).

Consequently, there remain genuine issues of material fact as to whether Mr. Smith's disclosing the documents was a protected activity, and thus, whether CTA's admission that it terminated Mr. Smith on this ground (and on his failure to cooperate in CTA's investigation into the disclosures) constituted retaliation. Accordingly, we deny both parties' motions for summary judgment on this ground.

**2.**

In the alternative to his argument that he was terminated for disclosing the allegedly confidential documents, Mr. Smith contends that a series of CTA employment decisions dating back to June 2011, right after he complained about Ms. Taylor, were all part of a pretextual "scheme" by CTA to terminate him (Pl.'s Resp. Br. at 13-14).

"Retaliation claims under Title VII require traditional but-for causation," *Cung Hnin*, 751 F.3d at 508 (internal citations and quotations omitted), which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. –, 133 S.Ct. 2517, 2533 (2013)). A plaintiff may satisfy this burden by presenting a "convincing mosaic" of circumstantial evidence; *i.e.*, "admissible evidence that, when taken as a whole and viewed in a light favorable to [the plaintiff's] case, could convince a reasonable jury that he was the victim of unlawful retaliation." *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 643 (7th Cir. 2013). This circumstantial evidence could include, but is not limited to: "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Id.* at 643-44.

Mr. Smith contends that the following evidence creates a convincing mosaic of circumstantial evidence showing that his termination constituted retaliation. *First*, CTA transferred Ms. Manning to an administration manager position at the Howard Station and transferred Mr. Smith to CTA headquarters, knowing that the CTA would have one administration manager beyond what the budget permitted, so that it could justify terminating

Mr. Smith (Pl.'s Resp. Br. at 13).[7] *Second*, Mr. Smith points to one of the allegedly confidential emails that included his name on a layoff list of Transportation Managers in July 2011, six months before he was transferred into that position (*Id.* at 8-10). *Third*, Mr. Smith alleges that by transferring him to a Transportation Manager I position, CTA placed him "in a position where he lost seniority and became the first eligible for layoff should his position become eligible for layoffs" (Pl.'s Mem. at 4). *Fourth*, Mr. Smith points to the short period of time between the IDHR fact finding hearing and his termination (*Id.* at 11). While CTA argues that plaintiff's termination could not be causally related to his first IDHR charge because he was terminated seven months later (Def.'s Mem. at 7-8), CTA cannot dispute that the termination came on the heels of the investigation into that charge.[8] Mr. Smith contends that this evidence shows CTA's intent to terminate him for retaliatory reasons.

On the flip side, CTA argues that it had a legitimate business reason for each action it took. *See Vaughn v. Vilsack*, 715 F.3d 1001, 1007-08 (7th Cir. 2013) ("in many cases, analysis of the 'legitimate expectations' prong of the prima facie case is very much akin to, or merges with, the question of pretext"). CTA argues that it transferred Mr. Smith to CTA headquarters on a temporary basis because his work performance had been below expectations and transferred him to the Transportation Manager I position when no other position was available (Def.'s Resp. Br. at 14). Then, as explained above, CTA contends that it terminated Mr. Smith for violating

---

[7] While these job transfers did not constitute materially adverse actions in themselves, we may consider these actions as part of the alleged mosaic of circumstantial evidence demonstrating that Mr. Smith's termination constituted retaliation under Title VII. *See Dass*, 675 F.3d at 1070-71.

[8] CTA argues that at the very least, Mr. Smith's discharge could not be causally related to his filing a second IDHR charge on March 14, 2012, because CTA did not know it had been filed until after he was discharged (Def.'s Mem. at 8, citing DSOF, at ¶ 66). Indeed, CTA attached the affidavit of Lyvette Medina-Jones, an executive assistant in the labor and employment section of the CTA's law department, attesting that CTA first received the notice on April 9, 2012 (DSOF, Ex. K). As plaintiff does not contest Ms. Medina-Jones's affidavit, we agree with CTA that Mr. Smith's second (and, of course, third) IDHR charge cannot form the basis for his retaliation claim.

CTA rules and regulations in disclosing confidential documents and failing to cooperate with the investigation into his disclosure of those documents (*Id.* at 11-12).

The evidence submitted on summary judgment persuades us that the question of whether Mr. Smith was terminated for a legitimate reason or a pretextual one is a matter for the jury, and thus both motions for summary judgment fall short. The Seventh Circuit's analysis in *Hobgood*, which viewed the plaintiff's evidence in that case "as a comprehensive whole" and "in a light favorable" to the plaintiff's case, informs our decision here. *Hobgood*, 731 F.3d at 643-44. In *Hobgood*, the plaintiff claimed that he was investigated, disciplined and terminated because he had helped a colleague with his Title VII retaliation and RICO lawsuits against their employer. In helping his colleague, the plaintiff provided him with confidential information, including a memorandum describing a conversation he had with a supervisor regarding the colleague's application for promotion and a form approving someone else for that promotion. *Id.* at 637-38. After this confidential information was disclosed in the colleague's lawsuit, the employer investigated the plaintiff for wrongdoing, ultimately terminating him for conduct unbecoming an employee, failure to care for official documents, and unauthorized use of confidential information. *Id.* at 638-41. The district court granted summary judgment on the grounds that the evidence showed that the plaintiff was terminated for providing confidential information, not for assisting his colleague with his lawsuits. *Id.* at 641. The Seventh Circuit reversed and remanded, finding that the evidence viewed as a whole could support a reasonable inference that the employer terminated the plaintiff in retaliation for his protected activity, and thus, that genuine issues of material fact existed concerning the employer's motives for investigating, disciplining, and terminating him. *Id.* at 644.

As in *Hobgood*, we find that the parties' evidence taken as a whole creates a genuine issue of material fact as to whether CTA's stated reasons for terminating against Mr. Smith were pretextual.[9] In other words, based on the summary judgment record, a reasonable jury could conclude that a "convincing mosaic of circumstantial evidence" shows that CTA fired Mr. Smith because he engaged in protected activity. Therefore, due to the remaining genuine disputes as to material fact surrounding Mr. Smith's direct and circumstantial evidence of his termination, we deny Mr. Smith's partial motion for summary judgment, and we deny CTA's partial motion for summary judgment as to the issue of Mr. Smith's termination.

## CONCLUSION

For the foregoing reasons, we deny Mr. Smith's partial motion for summary judgment (doc. # 51), and grant in part CTA's partial motion for summary judgment (doc. # 48). The matter is set for a status hearing on August 27, 2014, at 9:00 a.m. At that time, the Court will discuss with the parties prospects for settlement and a trial date.

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

DATE: August 5, 2014

---

[9]We do not, however, find any evidentiary support for Mr. Smith's argument that similarly situated employees outside his protected group were systematically treated better than he was. He points only to Mina Manning as his "female comparator" (Pl.'s Mem. at 1, 8), but, as CTA points out, there is no evidence that she was similarly situated to Mr. Smith (Def.'s Resp. Br. at 13). Similarly situated means with respect to performance, qualifications, and conduct, *see, e.g., Harris v. Warrick County Sheriff's Dep't*, 666 F.3d 444, 449 (7th Cir. 2012), but there is no evidence that Ms. Manning committed any of the infractions that CTA alleges Mr. Smith committed, such as violating CTA's confidentiality rules or being uncooperative during a CTA investigation.